Case No. 24-5022, Tiffany Lewis, Appellant, v. Douglas A. Collins, in his official capacity as Secretary of the Department of Federal Affairs of the United States. Ms. Huff for the Appellant, Mr. Bardo for the Appellee. Good morning. Good morning, Your Honors. May it please the Court, Sacred Be Huff on behalf of Appellant Tiffany Lewis. I will address two issues this morning. First, I will address the issue of timeliness. Second, I will address the glaring error of the District Court finding that Ms. Lewis' case lacks any evidence of discrimination, despite the fact that only two black candidates had their scores lowered during the selection process. In addition, the selecting official claimed that the white selectee had the best interview, despite the fact that the evidence established that the selecting official never conducted interviews. Turning to the threshold issue of timeliness, Ms. Lewis' deadline to contact the counselor must be extended under the EEOC's regulations. The District Court in this jurisdiction has recognized the general principle that a person should suspect discrimination upon learning that someone outside of their race or outside of their gender has been selected. However, the District Court has also considered other relevant facts when appropriate. Here, even though Ms. Lewis knew that the selectee was outside of her race and gender, no reasonable person would have immediately suspected discrimination under the circumstances of Ms. Lewis' case. Any indicia of discrimination were obscured by other relevant facts. First, the selectee had a doctorate, which Ms. Lewis lacked. Second, Ms. Lewis was not interviewed for the position, so she was unaware that she was actually one of the top-scoring candidates. Under those objective facts, any reasonable person would have believed that the selection was based on relative qualifications, not race, not sex. Ms. Lewis did not develop a reasonable suspicion of discrimination until she met with the selecting official's supervisor on an unrelated matter. During that conversation, the supervisor asked Ms. Lewis unsolicited about the selection process even though she did not raise the issue, and then the supervisor asked Ms. Lewis whether the selecting official and the selectee were living in the 1950s or something. Any reasonable person would have understood the racial undertone of that comment. Therefore, upon hearing that comment, that's when Ms. Lewis contacted a counselor within 45 days of that meeting. Ms. Lewis did not wait until she had any proof of discrimination. She did not wait until she discovered the meaning of that comment, and she did not wait until she had any supported facts of discrimination. Well, she had circumstantial evidence. She had, in effect, the material for a prima facie case from the day the action was taken, which is so there's a kind of irony here where the prima facie case standard is quite low. She was qualified. She had applied for the job. Someone who was not in her protected classes was hired for the job. So in a very minimal sense, she had that from the get-go. And then, I mean, I think the difficulty for you is the wording of the regulation, which seems to cut against the idea of a reasonable suspicion standard where it permits tolling where the individual did not know and reasonably should not have known that the personnel action occurred. And so it's just it's not asking whether the person lacked knowledge that discrimination occurred, but that the personnel action occurred. And I'm just not sure, you know, despite the equities of Ms. Lewis's case and the irregularities that occurred in the granting of the promotion to someone else, it's not clear that you have the room that you would need under the regulation the way it's written. Thank you, Your Honor. I'd like to parse that out. There were several parts to that. But addressing first the question of the prima facie case, at the moment that Ms. Lewis learned of her non-selection, it is true that she knew that the selectee was white. However, at that time, she had no reason to suspect that he was not the most qualified candidate. Therefore, using your example of the prima facie case, had Ms. Lewis went to a counselor at that time and alleged discrimination because she believed that the most qualified candidate or who she believed at that time to be the most qualified candidate. Your Honor, I do not see that she would have established even a prima facie case when she's alleging what she believed to be the most qualified. Typically, when the employee raises a question of discrimination, it's because they believe that someone less qualified or there are other circumstances that give rise to the inference of discrimination. Yet here, it was the fact that the only inference was that the more qualified white person was selected. You're not asserting that to win, she would have to show that she was more qualified or that he was less qualified. But in order for that to raise an inference of discrimination, she would have to show that. I mean, someone who's qualified, even if at some marginal degree, the person who gets the job is more qualified, you can still make out a racial discrimination or a sex discrimination case if you're not as qualified, but you are qualified and you show that the decision was taken based on an impermissible factor and that the employer was not seeking necessarily only the most qualified, but just someone who was qualified and brought other skills. Your Honor, it's the fact that the discriminatory nature of the action was obscured by the objective facts of the selectees' qualifications. Also, going back to your second point regarding the text of the regulation, in appellant's brief, we state that the court need not defer to the EEOC based on Loper-Bright, but upon further review of Loper-Bright, the Supreme Court was not addressing the commission's or a federal agency's interpretation of its own regulation. Here, the EEOC is not interpreting a statute. However, because it's only interpreting its own regulation, and it's the EEOC who says that even with their revised regulation, that that incorporates the reasonable suspicion standard, it is our position that the court should give deference to the EEOC in reading its own regulation. In multiple cases decided by the EEOC, they recognize the reasonable suspicion standard, so we disagree with the district court in appellee's position that the reason the text of the regulation does not allow the reasonable suspicion standard. I had a few questions about the merits. So the threshold one is, what is the, is your theory a motivating factor theory or a because of theory? If this case were to go to trial, what, as you likely know, that dramatically affects the kind of relief that you can secure at trial. And so have you made, what's the theory? Which of the two roads are you going down? A motivating factor, your honor. Which means you can't get damages or anything like that. You just get declaratory relief, right? And some sort of injunction and maybe some other things, but you can't get, you cannot get damages. Under Title VII of the Civil Rights Act, yes, your honor, that you are entitled to compensatory damages. In a Title VII case, if you only show that a prohibited factor was a motivating factor rather than a but-for cause, you are not entitled to damages. You have to show that it's a but-for cause in order to get damages. So it's why it's important to know what the theory is. Your honor, under the federal sector regulation, which is different from private sector. So even under a motivating factor, yes, a plaintiff would be, a federal sector plaintiff would be entitled to compensatory damages. And then if it does go to trial, it'll be your burden to show that Rice played at least a motivating factor. And I understand the argument based on reducing the scores. Is there anything else at trial in the record that you would point to to affirmatively suggest that this selecting official was motivated by racial animus? Yes, your honor. Of course, as you mentioned, there is the change of score, not only of Ms. Lewis's score, but another black candidate's score. But there are several because, again, going back to the district court's opinion, the district court found that this case lacks any evidence of discrimination, even though Ms. Lewis has demonstrated the falsity of several shifting explanations that the secretary has provided. And contrary to the district court's understanding, the falsity of the employer's explanation will allow a jury to infer discriminatory motive. Here the explained reasons were shifted numerous times. But in addition to that, it's the fact that accepting the initial explanation that Ms. Lewis wasn't selected, the selecting official stated that she tied with another male candidate. Instead of interviewing both candidates, according to the selecting official, he lowered only Ms. Lewis's score. That aversion to interviewing any woman is also evidence of a sexist motive, but not only the shifting reasons, but his evasiveness. The selecting official had an opportunity to provide an explanation for his reasons on multiple occasions. There was an investigation from the whistleblower's office. There was a separate investigation from the EEO office. Instead of participating in those investigations, he resigned abruptly. So that evasiveness is also circumstantial evidence of discrimination. And I see that I'm over my time. We'll give you a couple minutes and reply. Okay, thank you. Mr. Bardo? Can I ask you about the December meeting? And my recollection is that the three people involved, Reid, who got the job that Ms. Lewis wanted, Ms. Lewis, and the supervisor above everybody, including Brinker, that that meeting was because she was not given the opportunity by Reid to take some sort of six-month assignment. That's correct, Your Honor. All right. And so how did the failure to get the promotion that Reid got enter into that conversation? Is it in the record? The only thing we have in the record regarding that, Your Honor, is Ms. Lewis said that during the conversation, Mr. Burgess unprompted asked her if she had applied for the supervisory position. When Mr. Burgess was deposed, he said he didn't recall mentioning it. But we do. We just have that testimony from Ms. Lewis. But the meeting was about, like you said, Your Honor, this opportunity to do a six-month detail. And Dr. Reid said, I can't allow it because losing you will be detrimental. We value your work in the office, but you're welcome to escalate it if you would like. And Ms. Lewis elected to do so. But that's ancillary to the main controversy in this case. And we would just point that under this court's existing precedence, Tiffany Lewis's obligation to contact an EEO counselor within 45 days began on the date that she learned that she was not selected for the supervisory position, but that Ernest Reid, a white male, was selected instead. And because Ms. Lewis did not do this, she did not timely exhaust her administrative remedies. And this court in the past has said that, has assumed without deciding that the reasonable suspicion standard applies, and nonetheless has held that that's a crime. Is that a good legal rule, if that were our rule, anytime you apply for a job and someone who has a different race from you is hired, it's on you to immediately suspect racial animus? It is, Your Honor, because the point of the regulation is to resolve these things quickly. The burden on the- And the effect is that if someone thought, boy, I was qualified, but that guy, he's great, he's more qualified than I am, and so they don't suspect anything, and six months later they find a piece of paper, it's an email that says, I didn't hire her because she was black. You're, and that's a pretty good reason to suspect for the first time this was racially motivated, and the consequence of your rule is that claim is time-barred, because the person didn't run around with a sense of racial grievance in the first place. Well, the text of the regulation, Your Honor, says, oh, that's the rule. It's within 45 days of learning of the personnel action. Completely appreciate the argument on the text of the regulation. I'm asking about what constitutes reason to know that discrimination occurred, and it seems to me a very odd rule if we've really said you ought to immediately go and investigate just because someone who's not your race was selected for a position. Well, the EEOC considered that argument when it promulgated the regulation, but it decided it was best to resolve these things quickly and encourage people to come forward to the EEOC. All a complainant would need to do is call the EEOC counselor and say, I think there might be discrimination here, and the EEOC counselor can then go talk to a few people and maybe come back and say, I'm sorry, ma'am, we acknowledge you submitted this complaint, but we looked into it a little bit, and there's nothing here. They determined that that was preferable to having these issues sit around in the EEOC. I appreciate that. Yeah, so we have a couple of interesting cases, one of which Ms. Lewis cites in her brief that sort of say notwithstanding the regulation, there is a more general equitable tolling rule. And so one of these cases is Alsafi v. Vilsack, and it relies on a case that Ms. Lewis did cite, which is Lowe v. Heckler. And what Alsafi says is, we have this regulation, but separate and apart from it, we have a rule that the time within which EEO counseling must be sought is likewise tolled until the claimant knows or has reason to know the facts that would support a charge of discrimination. So that's not talking about the reasonable suspicion standard. It's importing the private employee equitable tolling rule into cases like this. Are you familiar with that case or know any reason why it wouldn't apply here? I believe that's a Sixth Circuit case, is it not, Your Honor? This is a D.C. Circuit case from 2016. I appreciate it wasn't cited in the briefs, but the Lowe v. Heckler case it relies on was cited, and it's a case exactly like this one. And it just says there's a free-floating tolling rule separate and apart from the regulation's  Well, the tolling rule is in the text of the regulation, and it says that the tolling rule only applies when the person did not know that the personnel action occurred. So this would apply in a situation like one of the personnel actions in Miller, Miller v. Hersman, where the plaintiff knew the selection had occurred, but wasn't aware that the selectee was not in his protected class. That seems like a very strange, like just very narrow rule if here Ms. Lewis concededly knew that the person was in protected class, but that factor is the stand-in for is the someone aggrieved by what they think is a discriminatory action, not just has been subject to a non-discriminatory action. Like if you look at the regulation and read it all together, it seems to me significant that 1614.104A talks, it's directed at aggrieved persons who believe they have been discriminated against, and then it talks about an aggrieved person having to initiate contact, but the aggrieved person is someone is defined as someone who believes they have been discriminated against in, you know, at the top of the regulation. And then in the discussion, there's a question about whether the person knew or reasonably should have known about the discriminatory matter or personnel action. And it seems, I know there's a dispute in the briefing about whether discriminatory applies only to matter or also applies to personnel action. It seems like the top-line definition of an aggrieved person is someone who believes they've been discriminated against supports the distributive reading of discriminatory matter or discriminatory personnel action. And I guess the question is, why would the government take a different position? And maybe this is just repeating the question that Judge Garcia asked, which is, it seems like it fosters a kind of mistrust and seeing discrimination under every rock, as opposed to fostering confidence in the decision-making and only running the time when someone is alerted to something more particular that actually raises a suspicion or a concern, puts the person on notice that they should be investigating for potential discrimination. Right, yeah, yes, Your Honor. I mean, that's a policy choice that the Commission made and how it- And I guess I'm really focusing on the language of the regulation. I mean, the- The person aggrieved is someone who believes they've been discriminated against. And if they don't have reason to believe that yet, because even though they didn't get the promotion, they didn't know or reasonably know that the personnel action was a discriminatory personnel action. Well, they- Why wouldn't that be the most reasonable way to read this? Because knowing that the selectee was someone of a different race or someone not in your protected class is enough to believe that you were discriminated against under these regulations and under this court's prior precedents in Stewart and Andrea Lack. What about Miller, which really seems to adopt the reasonable suspicion standard? You would just say, yeah, but only insofar as you don't know the race or sex or protected characteristics of the selectee. Well, Miller didn't really parse the text of the regulation. It didn't ask- deal with the question of whether reasonable suspicion applied. But it's similar to Stewart and Andrea Lack. It assumed without deciding that reasonable suspicion applied. And this court can do the same thing in this case by following Miller and Stewart and ruling that because Ms. Lewis didn't contact the EEO counselor within 45 days of learning of the personnel action, her claim is time barred. But it does rely- Miller does rely on the reasonable suspicion standard because Miller knew of his non-selection, but he only later learned of the sex of the selectee and therefore had a reason to suspect that sex discrimination might have been a factor. So I thought that was operative and not just assumed without deciding in that case. Am I wrong about that? I believe Miller did use language to that effect, but that shouldn't alter the outcome in this case because unlike in Miller, Ms. Lewis knew of the sex and the race of the selectee. Right. So it's the narrowness of the reasonable suspicion standard, not that the court didn't, in fact, embrace because it did embrace it there. It did, but in later cases, the court has- I believe Drielack was after Miller where the court said that we haven't officially decided that the reasonable suspicion standard applies. But the court, in this case, though, doesn't even need to answer that question where reasonable suspicion applies. It can simply follow prior precedent. On the merit- do you agree with Ms. Huff that in a suit against a federal employer, the causation standard is a motivating factor? Will it stop? We- I'm sorry, could you repeat that question, Your Honor? My understanding was that at least in suits against private employers, the statute draws a distinction between cases brought on a motivating factor theory or a but-for theory, and the remedies differ. Ms. Huff said that distinction doesn't exist in cases against the federal government. Do you agree with that? We disagree with that, Your Honor. Your Honor was correct that for a motivating factor theory, Ms. Lewis would be- would not be entitled to pain and suffering damages, but were she to appeal, she could be entitled to attorney's fees and possibly injunctive relief. So she'd be entitled to back pay, but not other forms of compensatory relief. That's correct, Your Honor. Was there some- so Brinker decided- the record says he decided he was going to interview two people. Was there some policy that required him to do that, or was that just his stated choice? There was no policy, Your Honor. That was simply his stated choice for how he wanted to fill the position. Okay. And doesn't that actually undercut the government's theory that this might have been improper, but if it was improper, it was just because he pre-selected his friend, Reed? It actually makes it look like there was a legitimate interview process going on. And plaintiffs would say, once they realized, based on the resume scores, that he might have to interview a Black person, they made some changes so that both Black applicants fell below the interview cutoff. Well, the- this was- Brinker simply made an error when he was combining the score sheets, and he was- the story he told, it came out piecemeal, but it's part of one continuous story. This is something that I have a little bit of trouble about in the way the district court wrote the opinion. Saying that about the facts is to decide the issues of fact, not to ask whether a reasonable fact finder could find otherwise. A reasonable fact finder might decide that it's all one, and he was making some kind of surmise about having, you know, broken the tie, and then later he realized, no, I just made a keyboarding error. Without giving a spin or a preferential reading as a fact finder would, there are a lot of conflicts in the decision-maker's testimony here, no? Well, we would disagree, Your Honor. Mr. Brinker had always maintained that he only intended to interview two applicants, and he had thought previously that he- that if two candidates were tied, he would break the score himself. But in this case, he didn't need to break- or, excuse me, break the tie himself. In this case, he didn't need to break the tie himself because when he made that keyboarding error changing one of William Itell's scores from a 5 to a 4, Ms. Lewis was one point below Nathaniel Turnipseed. And with regard to- Can you clarify, do you understand the relationship between Wilson and Brinker? Was it- Wilson's title is executive assistant, so he's sort of, like, sitting next to Brinker's office, do you- He wasn't- I don't believe he was in Brinker's chain of command. But he didn't know Ms. Lewis, and he didn't know any of the races of the applicants. So he completely went in blindly in terms of race as he was reviewing the names on the list. He testified that he didn't know Ms. Lewis's race, he didn't know Reginald Wright's race. Although isn't there also at least conflicting evidence in the record insofar as I think both Ms. Lewis and Mr. Wilson said that they had been at meetings and various, you know, gatherings of personnel where they had met him, they knew who he was, and they assumed that he would know who they were, and that by observing them he would know their sex and race. Well, Mr. Wilson, I believe his testimony was that he may have seen Ms. Lewis, but it didn't seem as though he would be able to pick her out of a lineup. Right, that's his testimony. But she and he, Wilson and Lewis, raised a contrary factual assertion from which, as a matter of circumstantial evidence, a fact finder might find that that was not the case, that he actually did know who they were and he knew their sex and race. Well, that contradicts, though, Mr. Wilson's sworn testimony. Exactly, but they've also given sworn testimony. That's why we have juries. I'm just saying that we were at a summary judgment posture here, and so his testimony would defeat her ability to win on summary judgment, but it wouldn't eliminate a material dispute of fact that would defeat the government's summary judgment. Well, Your Honor, isn't Mr. Wilson in a better position than Ms. Lewis to know what Mr.  That would be an argument for the jury, right? It would be, but the plaintiff kind of misconstrues the deposition testimony from Mr. Wilson, and where he never says that he knew who Ms. Lewis was and knew what her race was. He just said, I may have seen Ms. Lewis at some conferences. So let me ask you something. This record, even though it's on summary judgment, is replete with cronyism, and the way I read it, Brinker had made up his mind before anybody else applied with the telling, read, no worries, I'll send you this ahead of time, so on and so forth, so that he'd made up his mind before Ms. Lewis even applied for the job. So how do we factor that in to whether there was any evidence of discrimination other than this third party making this remark? Well, it's clear from the record that Mr. Brinker and Dr. Reed had a professional friendship, so to speak. They would exchange resumes. They would exchange ideas on various projects they were working on, and it is possible that- Is there any dispute that he told him ahead of time, don't worry, you've got the job? There's all sorts of quotes. I know there is testimony in the record to that effect, but that would just show evidence of preselection, and preselection in and of itself is not unlawful. In this situation, I think I read that all the people in the tier that Ms. Lewis and Mr. Reed, and I think maybe that their tier was all people who were either women or members of racial minorities or groups or both. And so the applicant here out of, I think, was the white applicant who was male was Reed. That's correct, but these are all- How can you disaggregate so-called cronyism from race and sex discrimination? I mean, if you look historically at the development of civil rights law and the understanding through litigation of how discrimination often works, it's not because someone is being hateful, it's because they want to bring someone close to them to work with them who they identify with more, they feel more comfortable with. They might not feel comfortable working with someone who is not of their same race. And so I'm not sure that the cronyism is somehow excludes a jury's ability on this record to find that there was, in fact, discrimination. Is that your argument that it would exclude that or just that the- I'd just be interested in your addressing that. Well, in order to establish pretext, the plaintiff needs to show, one, that the employer's explanation was false and two, that the motivation was discrimination, not some other reason. And there's- given Mr. Brinker and Dr. Reed's professional relationship, you can't jump to the conclusion from there that it somehow was based on race. They knew each other from their days serving together in Iraq. So if it's cronyism, isn't that separately? I mean, it's not part of Ms. Lewis's case, but isn't that separately a violation of civil service law? Did the agency ever pursue that? I mean, you have to have a posting. It has to be public. You have to follow certain procedures. It sounds like there's at least a violation of civil service law, no? There is not because they did post the opportunity and they did review multiple resumes and interview two candidates. So you're not saying that the government's legitimate non-discriminatory reason was cronyism? No, we're not saying that. Just that the bias, if there was it, is cronyism. Yeah, we're saying that to the extent that Ms. Lewis has maintained that Dr. Reed had an unfair advantage. And to the extent that there is an unfair advantage, the record shows that it's because of their prior professional relationship. This is going back to one of my earlier questions. If he had just decided to pre-select Reed, why did he interview two people? Why did he have all these scores go into the resume? It sounds like he hadn't pre-selected Reed. He wanted to, or at least someone could conclude, he wanted to interview the top two applicants, which is what he said. And then it sure looks like, right? Why did he interview two people if he pre-selected Reed? Well, we're not saying that he did pre-select Reed. I mean, he knew Mr. Reed. He knew Mr. Turnipseed, who was the runner up. The district court said he pre-selected Reed and he knew Turnipseed. So then he was faced with, if he wanted to... Your position is that he did interview Mr. Turnipseed? He did, yes. Because he wanted to know if Mr. Turnipseed was a better applicant than Mr. Reed? I would presume so, Your Honor. Yes. Right. And what the plaintiff says is because he had committed to interviewing two people and he saw that the second person was going to be a black woman and potentially a black man, he instructed Wilson to lower the score for those two applicants. And Brinker and Wilson will testify that that didn't occur. And they will cross-examine and argue in closing that that is exactly what occurred, because otherwise this is just too fishy to buy. And why is that an unreasonable argument to make to a jury? Well, there's no testimony that Mr. Brinker told Mr. Wilson to lower the scores of black applicants. That's not on the record. That would be direct evidence of discrimination, which nobody ever has. Right. Instead, you rely on circumstantial evidence, which is they mysteriously docked the score, not of the white applicant, Mr. Turnipseed, but of the two black applicants. And when you look at the email exchange, it does not say, I looked at their resumes, and so I'm lowering the score. There's no explanation given for day one, good score for Ms. Lewis, day two, bad score. It just says, here you go. And a reasonable juror could conclude there was a separate discussion about why he was doing that, couldn't they? I would disagree, Your Honor, because there's testimony from Mr. Wilson for why he lowered the score. And the reason he lowered the score is because both Ms. Lewis and Mr. Wright had applied for a substantially similar position in Chicago, and Mr. Wilson was reviewing applications for both, and he took a second look at the headquarters list after he had finished reviewing the resumes for Chicago to make sure his ratings were consistent. And that's what led to the scores being lowered. He wanted to make sure the headquarters scores were consistent with the Chicago scores. Okay, thank you. Thank you, Your Honor. Ms. Hope, why don't you take two minutes? Thank you, Your Honors. I want to address the two very important factual points that were raised. Judge Henderson, to your point, you mentioned that there were three attendees to the December 26, 2018 meeting. However, there were only two attendees, the selecting official supervisor and Ms. Lewis. The district court was wrong then because he said Reed was there. Exactly. We pointed that out in our brief that that is incorrect. On Joint Appendix page 139, you will see a calendar invitation from Burgess. That's the selecting official supervisor, and it's two Ms. Lewis only. So, they were the only two people who attended that meeting, which made it even more bizarre that Burgess brought in—Burgess being the selecting official supervisor—brought up the selection process. Now, it was Reed who helped organize the meeting because he escalated the issue. But to be clear, he was not present. Okay. Going to another point raised by the secretary, the secretary explained that one of the reasons that Wilson allegedly lowered the score of two Black candidates was because after he looked at the Chicago score sheet, which is an unrelated position—or a different position, I should say—he then looked at the headquarters position. But if you turn to Joint Appendix 56 and you look at the email, Wilson had already completed the Chicago score sheet on July 20, 2018. That's prior to when he completed the headquarters. And you see in the email, he's responding to his initial email providing the headquarters score sheets. So, the whole explanation itself isn't worthy of any credence. And after he provided the headquarters position, that's again when he lowered the position. And that's where you see on July 24, after he's already reviewed the Chicago score sheets, after he's already reviewed the headquarters score sheets, he then lowers the scores of the two Black candidates. And there's no dispute on that fact. I'm not sure I'm following. I mean, I understand generally what you're—the point you're trying to make. But the—it's not credible that he was trying to align his scores across the two promotion competitions by—when he lowered Ms. Lewis's score because—something about the chronology? Exactly. Because the secretary states that initially the—Wilson provided the headquarters score sheets. Then he reviewed the Chicago score sheets. And upon reviewing the Chicago score sheets, he re-looked at the headquarters score sheets. But if you look at Joint Appendix 56, that's not actually what happened. So, if that's his explanation— But I had read that a little bit differently, that he had submitted the Chicago score sheets, as you say, earlier. Exactly. And then he's doing the headquarters one. But then he reviews—I mean, he looks back, and he sees, oh, I gave a different score, and I've already handed it in for Chicago. So, instead of changing that one up, I should change this one down. That's what I took to be the narrative. Is that—is that contradicted by the evidence of record that you're pointing to? The notion that he could have submitted it but then referred back to it. That's not what he says? Well, that's not what was explained, and that's not what's in the secretary's brief. In the secretary's brief, they explained that he hadn't submitted the Chicago score sheets. But that's plainly incorrect, because you see that the email was already given on July 20, 2018. Wilson then provided the headquarters score sheet initially on July 23, 2018. And then, again, on July 24, that's when he changed the score sheets. Specifically, by changing, he lowered the scores of the two Black candidates. So, he submitted not only the Chicago one already, but he says he hadn't. And then he submitted the headquarters one, and after he submitted, he changed it. Exactly. At least that was the argument in the brief. So, I think really the hard point for you in this case is the timeliness point. And we have the reading of the regulations that there is a reasonable suspicion standard. But the really tough hurdle, I think, is that Miller and Drylock seem to say that the reasonable suspicion standard is met as long as the claimant knows that the selectee was not in the protected class that she is in. And so, it seems like a very narrow reasonable suspicion standard, at least as our court has read it. And I wonder if you have any cases that are strong on that, or any authority that you would want us to look at. I mean, I know Judge Garcia raised a slightly separate authority that is from our court and binds us. Is there anything more that you have on that? Your Honor, this court hasn't addressed Ms. Lewis's circumstances directly. And even reading just the general principle of the reasonable suspicion standard, it doesn't contemplate other facts that may obscure the discriminatory nature. As we discussed earlier, generally, when someone believes that they are the most qualified candidate, and then they see that someone else has been selected, yes, under those circumstances, seeing someone outside of your protected class may give rise to a reasonable suspicion. But that cannot foreclose any other facts that may either obscure the discriminatory nature or situations like Ms. Lewis's, in which she's really the exception to the general rule. And even with the general principle, it's actually silent on, is there any other situation in which, when you see that someone is outside of your protected class, is there ever a situation in which that alone does not give rise to reasonable suspicion? And just as a policy matter, it cannot be dispositive. In just the text of the regulation itself, the EEOC makes clear that it's intended to be a broad exception to this general rule to contact the counselor in 45 days, because if you look at that last clause, that the deadlines can be extended for any reason deemed sufficient by the commission. But the commission didn't extend in this situation, which is troubling. I take your point that there is a kind of generosity with exceptions, at least where the commission is concerned. But I guess my assumption would be that writing the rule the way it is to leave broader discretion to the commission doesn't necessarily imply a broader reading of a tolling that could be triggered by the claimant herself. And I guess the concern is, if we were to adopt the rule that you advocate, that a plaintiff's reasonable belief that the selectee is more qualified than she was, and if that could indefinitely toll the limitations period until the claimant learns otherwise, it seems that many, many people would be able to make the same claim and render this 45-day time limit illusory. You say that her situation is unusual, but the rule that you've advocated, it just seems like it could blow a big hole in the 45-day limit. Your Honor, if I may address that, it's the fact that the court, in examining what triggered reasonable suspicion, would have to look at what fact was available later that wasn't available when the plaintiff first learned of the non-selection. So that's why Ms. Lewis's case is unusual in that she did have this triggering event, the meeting with the selecting official supervisor, and that may not be available or that may not be the circumstance in other cases to blow up this 45-day deadline. Because typically, if someone believes that they have been discriminated against and they're not waiting for supportive facts, because that's a standard that we're not advocating for, they can't wait until they have proof of discrimination. Only reasonable suspicion, and that's what Ms. Lewis did. So in other cases in which other people, they may already have a suspicion, but then they wait to collect facts, they go speak with their coworkers, well, that would demonstrate that they had some suspicion, but they sought supportive facts or they sought evidence, and that's not what we're advocating for. But in addition to that, if it's an unusually long time, so let's say that a plaintiff waited three or even five years, well, other doctrines will apply. You have the doctrine of latches. So that would essentially kind of cure the issue that you have raised. But I see— What's the statute of limitations for her, putting aside the exhaustion? Well, I guess, let me be sure in your question, you said the statute of limitations. Well, to even bring the claim that it's the 45 days to contact the counselor. But in terms of filing in court, assuming you've exhausted timely, isn't there also a period of time by which you have to—is it three years or—? No, Your Honor. So once there's been final action, so in this case, whether it's the final decision of the EEOC or even a final agency decision, she has 90 days to bring her claims to court. I just have one detail, and that is—and I can find it in the record, but I just want to clear it up now—I thought no one was interviewed. Well, Your Honor, that's a disputed fact, all the more reason that this case, assuming the Secretary has articulated legitimate reason, needs to be remanded. Does Lewis dispute—she obviously wasn't interviewed—that Turnipseed was not interviewed? Well, it's the fact that, again, it's disputed, but the selecting official conducted no interviews. The selecting official did not interview the selectee or any other candidate. Therefore, there's falsified records, because there are interview score sheets, but those are falsified records, Your Honor. So I'll ask again, was anybody interviewed in your estimation, in your opinion? No, Your Honor. No interviews were conducted. Great. Thank you.
judges: Henderson; Pillard; Garcia